IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIK HERZFELD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:07-cv-9439 DLC |
| ) | ECF CASE |
| ) | |
| JPMORGAN CHASE BANK, N.A. ) | Jury Trial Demanded |
| ) | |
| ) | |
| Defendant. ) | |

## AMENDED COMPLAINT

NOW COMES Plaintiff Erik Herzfeld, by and through his counsel Paul Frank + Collins P.C., and hereby complains as follows:

**Parties, Jurisdiction, and Venue**

1.  Plaintiff Erik P. Herzfeld is a citizen of the State of Florida, residing in Miami Beach with a mailing address of 300 South Pointe Drive, Miami Beach, Florida 33139

2.  Defendant JPMorgan Chase Bank, N.A. ("JPMorgan Chase") is a national bank with its main office in Columbus, Ohio that is duly authorized to transact business in New York. JPMorgan Chase's holding company, JPMorgan Chase & Co., is a Delaware corporation duly organized and in good standing under the laws of the state of Delaware, with a principal place of business located at 270 Park Avenue, New York, NY 10172.

3.  Subject matter jurisdiction exists under 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the matter in controversy exceeds $75,000, the jurisdictional threshold established by 28 U.S.C. § 1332(b)

4. Venue is proper under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the plaintiff's claim occurred in New York City, which is within this judicial district.

## General Allegations

5. Mr. Herzfeld was hired by JPMorgan Chase in 2000 and worked for JPMorgan Chase in Singapore and Tokyo through 2004.

6. In 2004, Mr. Herzfeld received total compensation from JPMorgan Chase of approximately $1 million USD. He was in charge of JPMorgan Chase's Singapore Emerging Markets Option Trading Desk, directly managing four traders and co-managing eight others.

7. In or around February 2005, Mr. Herzfeld was recruited by Bank of America ("BofA"), one of JPMorgan Chase's competitors, for a position as Principal in its Foreign Exchange Options Group. In this position, Mr. Herzfeld would have reported to the Global Head of Foreign Exchange Options who was a managing director of Bank of America.

8. Mr. Herzfeld received a written two-year contract offer from BofA to manage its Correlation Option and Emerging Market Option Trading Desk.

9. As part of the contract, Mr. Herzfeld was offered a base salary of $150,000 and a guaranteed minimum bonus of $850,000 with incentives based on percentages of net trading revenues up to $3 million USD in 2005. For 2006, Mr. Herzfeld would receive a base salary of $150,000 and incentives based on percentages of net trading revenues up to $3 million USD. BofA also offered Mr. Herzfeld an award of

8,430 shares of BofA restricted stock, or a cash equivalent, to reimburse him for the unvested stock options or grants that he would forfeit upon leaving JPMorgan Chase.

10. Soon thereafter, Mr. Herzfeld gave notice to JPMorgan Chase that he was resigning from the company. In response to Mr. Herzfeld's notice, JPMorgan Chase told him that they did not want to lose him, particularly to a competitor such as BofA. Mr. Herzfeld was convinced to fly to New York to meet with Patrik Edsparr, the head of North America trading for JPMorgan Chase.

11. Mr. Herzfeld explained the deal he had been offered at BofA to Mr. Edsparr in detail. He further explained that he was considering leaving JPMorgan Chase not only for the money that BofA offered, but for the opportunity for him to create a team of correlation traders employing the skills that Mr. Herzfeld had developed over the years.

12. Mr. Edsparr responded and said that there were better opportunities for Mr. Herzfeld in his group if Mr. Herzfeld joined Mr. Edsparr at the JPMorgan Chase Proprietary Positioning Business in New York. Mr. Edsparr represented to Mr. Herzfeld that JPMorgan Chase would match the opportunities offered to him by BofA and that Mr. Herzfeld would be given the authority to create a correlation trading team.

13. Mr. Edsparr and Mr. Herzfeld specifically discussed how many traders Mr. Herzfeld would need, where they would be located, the level of experience they would need to have, the type of trading they would do, and the length of time that Mr. Herzfeld would need to get the team set up and operating profitably.

14. Mr. Herzfeld told Mr. Edsparr that he would need the following:

    (a)    three traders to cover the time zones, one with him in New York, one in London, and one in an Asian money center such as Tokyo;

    (b)    traders with two to three years of experience, each, who would earn between $200,000 and $300,000 USD per year; and

    (c)    additional IT and capital support from JPMorgan Chase.

15. In response to Mr. Herzfeld's request, Mr. Edsparr represented that JPMorgan Chase would do all that Mr. Herzfeld had asked in its effort to persuade Mr. Herzfeld to stay with the company and to pass up the written offer that Mr. Herzfeld had received from BofA. Mr. Edsparr further represented that Mr. Herzfeld would make more money and have a brighter future if he were to join Mr. Edsparr at the JPMorgan Chase Proprietary Positioning Business in New York City.

16. In reliance on Mr. Edsparr's representation on behalf of JPMorgan Chase, Mr. Herzfeld turned down the offer from BofA and moved to New York City to start work with Mr. Edsparr on May 2, 2005 at a salary of $115,000 USD. The major portion of his compensation was to come in the form of bonus or incentive pay based on trading profits earned from the building of his team.

17. Although Mr. Edsparr represented that Mr. Herzfeld would report directly to him, upon starting work in New York, Mr. Herzfeld learned that he would be reporting to an intermediary supervisor, Mr. Derek Kaufman.

18. Mr. Kaufman told Mr. Herzfeld that he knew about the agreement Mr. Edsparr and Mr. Herzfeld had reached and represented that everything would remain as agreed. However, Mr. Kaufman explained that, due to Mr. Edsparr's increased

responsibilities following a promotion, Mr. Herzfeld would report to Mr. Kaufman on a day-to-day basis.

19. Mr. Herzfeld began recruiting traders for his correlation trading group and traveled to Japan to meet with prospective candidates. However, Mr. Kaufman rejected all of Mr. Herzfeld's proposed hires. Mr. Kaufman found fault with each one, always on a subjective basis of whether the person would "fit in" and never on an objective basis such as lack of skill or experience.

20. Mr. Herzfeld spent half of his time during 2005 on administrative work, hiring, and building trading systems.

21. In 2005, Mr. Herzfeld received positive performance reviews from Mr. Kaufman and other colleagues and was awarded a salary increase to $120,000 per year and a bonus of $200,000 as a token of JPMorgan Chase's appreciation for his staying and starting a correlation trading group at JPMorgan Chase.

22. Although JPMorgan Chase continued to block his efforts to recruit traders for his team, by early in the second quarter of 2006, Mr. Herzfeld had accumulated trading profits of approximately $12 million USD.

23. In early October 2006, Mr. Herzfeld began to experience some losses, which were predictable given that he had a large option position that started to decay. Mr. Kaufman, who had approved Mr. Herzfeld's position in meetings and discussions that included Mr. Edsparr, had the same position as Mr. Herzfeld and expressed his frustration as the losses increased. Mr. Herzfeld explained that the position was a good one and that he should be more patient with it.

24. Thereafter, in late October, despite having approved the position in numerous meetings, Mr. Kaufman abruptly ordered Mr. Herzfeld to stop trading. Mr. Kaufman then instructed Mr. Herzfeld to transfer the bulk of his position into Mr. Kaufman's account and to close the rest of his own positions in the market.

25. Within a few weeks, many of the recently transferred positions turned around and increased in value to the benefit of Mr. Kaufman's trading account, but not to Mr. Herzfeld's, whose trading authorization was never restored.

26. Thereafter, in late November, 2006, Mr. Kaufman abruptly informed Mr. Herzfeld that he (Mr. Herzfeld) would have to resign from JPMorgan Chase. When Mr. Herzfeld reminded Mr. Kaufman of the representations that Mr. Edsparr had made, Mr. Kaufman insisted that the decision to demand Mr. Herzfeld's resignation was his, but that he also had the full support of Mr. Edsparr. Mr. Kaufman was unequivocal and told Mr. Herzfeld that he must resign from JPMorgan Chase because he would not have a job at the firm in 2007.

27. Mr. Herzfeld received no bonus or incentive compensation from JPMorgan Chase for 2006 even though, on information and belief, the position he was ordered partially to close and partially to transfer to Mr. Kaufman's account recovered and produced a trading profit for Mr. Kaufman.

28. Although Mr. Herzfeld did not wish to resign from JPMorgan Chase, on or around January 31, 2007, he was told that JPMorgan Chase had decided to terminate his employment without any severance pay whatsoever and that he would forfeit the unvested portion of his stock.

29. Thereafter, on or about February 28, 2007, JPMorgan Chase terminated Mr. Herzfeld's employment.

### Fraudulent Inducement

30. Mr. Herzfeld restates each allegation set forth in Paragraphs 1-29, as if fully set forth herein.

31. JPMorgan Chase represented to Mr. Herzfeld that it would match the opportunities offered to him by BofA, including creating his own correlation team of traders.

32. The statements made to Mr. Herzfeld regarding JPMorgan Chase matching the BofA opportunities were made with knowledge of their falsity or in reckless disregard of the truth.

33. JPMorgan Chase made this misrepresentation for the purpose of inducing Mr. Herzfeld to rely on it and to remain at JPMorgan Chase instead of accepting an offer of employment from BofA, one of JPMorgan Chase's competitors.

34. Mr. Herzfeld reasonably relied on the misrepresentations, remained at JPMorgan Chase, and declined BofA's offer of employment.

35. JPMorgan Chase's misrepresentation caused substantial financial injury to Mr. Herzfeld.

WHEREFORE, Mr. Herzfeld requests the relief set forth below.

### Prayer for Relief

WHEREFORE, Plaintiff requests a trial by jury on all issues and a judgment against JPMorgan Chase for fair and reasonable damages of not less than $3 million to include:

a.  the compensation he would have been paid at BofA for 2005 and 2006;

b.  the value of BofA restricted stock that Mr. Herzfeld was to receive from BofA to reimburse him for unvested and foregone stock options that he would have forfeited upon leaving JPMorgan Chase;

c.  the value of the nonqualified stock options that were apparently cancelled upon his termination;

d.  an amount sufficient to compensate Mr. Herzfeld for the damage to his career development and objectives while he remained at JPMorgan Chase after turning down the offer of employment from BofA;

e.  costs of this action; and

f.  such other and further relief as this Court may deem proper.

Dated at Burlington, Vermont, this 11th day of January, 2008.

PAUL, FRANK + COLLINS P.C.

By: *John Sartore*

John T. Sartore
One Church Street
Burlington, Vermont 05402
Bar Code #: JS1814
Tel: (802) 658-2311
Fax: (802) 658-0042
Email: jsartore@pfclaw.com